## AGREEMENT REGARDING BONDING CREDIT

This *Agreement Regarding Bonding Credit* ("Agreement") is made effective as of June 23/2010 (the "Effective Date") between and among U.S. Coating Specialties & Suppliers, LLC ("USC"); Earl Washington ("Washington") (with USC and Washington sometimes herein collectively referred to as the "USC Parties"); and Mid State Construction Company, Inc. ("Mid State"). The "Premises" for this Agreement are as follows:

A.     USC has obtained and/or will obtain one or more bonds from Travelers Casualty and Surety Company of America (the "Surety") in relation to the ERDC Information Technology Laboratory Office Building and Computer Facility at the U.S. Army Engineer Research and Development Center in Vicksburg, MS (the "Project").

B.     The Surety provided same in reliance upon the indemnity agreements (collectively the "Indemnity Agreements") of Mid State, William S. Ware ("Ware") and P.G. Bernheim ("Bernheim") (with Mid State, Ware and Bernheim sometimes herein collectively referred to as the "Mid State Parties").

C.     As part of the overall arrangements between the parties, portions of the work for the Project shall be subcontracted to Mid State.

D.     The Mid State Parties are and/or will be willing (subject to the remaining terms of this Agreement) to assume the obligations to the Surety under each Indemnity Agreements, but only in exchange for the USC Parties' joint and several obligation of themselves as provided for in this Agreement.

E.     USC and Washington stipulate and agree that the benefits flowing to each of them, directly and indirectly, as a result of their affiliation with the other and the Project, are good and sufficient consideration for the obligations assumed by each of them under this Agreement.

F.     USC and Washington stipulate and agree that they enter into this Agreement as a material inducement to the Mid State Parties to proceed with the Indemnity Agreements, the procurement of bonds for the Project, and the entry into one or more subcontracts for the Project. USC and Washington further stipulate and agree that but for their agreement to the terms hereof, the Mid State Parties would not proceed with same.

NOW, THEREFORE, for and in consideration of the Premises, which are incorporated herein and made a part of this Agreement, the undersigned agree as follows:

1.  Mid State and USC shall work out acceptable terms for a subcontract (the "Subcontract") between Mid State and USC as to the Project. Once the Subcontract has been negotiated, agreed to and signed, Mid State shall then cause the Surety to issue the requisite payment and performance bonds (collectively referred to as the "Bonds") to the United States (the "Owner") for the contract (the "Contract") with the Owner for the Project. However, contemporaneously therewith the parties shall also execute the other agreements and instruments

MIDSTATE
000808

EXHIBIT
"C"

contemplated herein, including without limitation the "control" agreement as to the "Account" as referenced in Section 8 hereof.

2. As used in this Section 2, the term "Claims" shall mean any and all losses, damages, claims, assessments, penalties, liabilities, awards, lawsuits and costs (including attorneys' fees, costs and expenses) incurred or suffered by any one of the Mid State Parties in relation in whole or in part to the Indemnity Agreements and/or the Bonds. To the fullest extent allowed by law, the USC Parties jointly and severally agree to hold harmless, defend and indemnify each of the Mid State Parties as to any and all Claims; however, there shall be excluded from the foregoing indemnity obligation that part (but only that part) of Claims that arise only as a result of the acts or omissions of Mid State without any involvement in the underlying events by the USC Parties.

3. The USC Parties shall keep the Mid State Parties continually informed: as to the Contract; as to the Project; as to all subcontracts, purchase orders, and other agreements as to the Contract and the Project (with all said subcontracts, purchase orders and other agreements sometimes herein as a "Sub-Agreement"); and as to potential claims on the Bonds. The USC Parties will provide the Mid State Parties such information (documentary and otherwise) as the Mid State Parties request related to same. The Mid State Parties shall have the right, in their sole discretion, to determine for both themselves and for the USC Parties whether any claim on the Bonds and/or under the Contract should be paid, settled or compromised, and so long as they are made in good faith, such determinations shall be binding upon the USC Parties and the sums incurred by the Mid State Parties in relation to same shall be indemnified by the USC Parties as provided for above; however, the Mid State Parties shall consult with the USC Parties and attempt to agree on a course of settlement except where the circumstances justify unilateral action by the Mid State Parties, with the intent being that Mid State Parties would act unilaterally in settling claims only when the nature of the situation justifies it.

4. The following shall constitute a "Default":

    (a) any event of default under the Contract, under any Bond, under any Indemnity Agreement, under any Sub-Agreement, and/or as to the Project;

    (b) any breach by USC of its obligations under and/or as to the Contract, any Sub-Agreement, any Bond, and/or as to the Project, which in the good faith opinion of the Mid State Parties may result in an event of default as described in subpart (a) hereof; and/or

    (c) any breach by USC of its obligations under and/or as to the Contract, any Sub-Agreement, any Bond, and/or as to the Project, which in the good faith opinion of the Mid State Parties may result in any financial loss or losses as to one or more of the Contract, any Sub-Agreement, any Bond, and/or as to the Project, which financial loss(es) taken in the aggregate would exceed $50,000.00.

5. Upon the occurrence of a Default, the Mid State Parties shall have the right to: (a) take possession of the work under the Contract and to complete same, or cause, or consent to, completion thereof; (b) take over Sub-Agreements related to the Contract and/or the Project; (c) immediately take possession of the USC Parties' property related to the Project and/or the Contract and utilize same for completion of the Contract and/or the Project without payment for

MIDSTATE
000809

such use; (d) assert or prosecute any right or claim in the name of the USC Parties and settle same as the Mid State Parties see fit; (e) execute in the name of the USC Parties any instruments deemed necessary or desirable by the Mid State Parties to: (i) provide the Mid State Parties with title to assets, (ii) take immediate possession of funds as to the Contract and/or the Project whether earned or unearned, (iii) collect such sums as may be due the USC Parties and to endorse same in the name of the USC Parties, and (iv) collect on any negotiable instruments; (f) require any obligee (or the Surety) to withhold the payment of Contract funds until the Mid State Parties consent to the release of same; and/or (g) be subrogated to all the rights, remedies, properties, funds, securities and receivables relating to the Contract and/or the Project. The USC Parties hereby grant, assign, transfer and convey to the Mid State Parties all of the USC Parties' rights, title and interest in and to all assets and property of the USC Parties to the extent necessary to give the Mid State Parties the above rights in an event of Default. Further, in an event of Default and upon demand the USC Parties shall direct that all payments, monies, and properties that are due or may become due on the Contract and/or the Project be made payable to the Mid State Parties, and/or sent directly to the Mid State Parties, and shall issue whatever notices or writings as deemed necessary by the Mid State Parties to give the Mid State Parties the full benefit of the foregoing.

6. Each of the USC Parties hereby irrevocably constitute, appoint and designate each of the Mid State Parties as the USC Parties' attorney in fact with the right, but not the obligation, to exercise all rights of the USC Parties assigned or granted to the Mid State Parties and to execute and deliver any other assignments, documents, instruments or agreements deemed necessary by the Mid State Parties to exercise the Mid State Parties' rights under this Agreement in the name of any USC Party.

7. As security for their obligations hereunder, the USC Parties hereby grant to the Mid State Parties a security interest in the following properties, assets and rights of the USC Parties, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, subcontracts, purchase orders, agreements, accounts, chattel paper, deposit accounts, letter-of-credit rights, securities and all other investment property, supporting obligations, any and all Contract and/or Project rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (with all of the foregoing collectively referred to as the "Collateral"). This Agreement shall for all purposes constitute a security agreement for the benefit of the Mid State Parties in accordance with the Uniform Commercial Code ("UCC") and all similar statutes. The USC Parties hereby irrevocably authorize the Mid State Parties, without notice to any of the USC Parties, in order to perfect the security interest granted herein, to file either: (a) this Agreement or a copy or reproduction thereof; or (b) any initial financing statements or amendments thereto that indicate the Collateral. Likewise, the USC Parties shall execute such further documents and take such further action as the Mid State Parties request to give full and perfected effect to the foregoing.

8. Notwithstanding and in addition to the foregoing, the USC Parties shall execute such documents as are necessary to cause an assignment of all Contract proceeds such that all such proceeds are paid directly into account number _____ with _____ Bank (the "Account"), and to cause such Account to be restricted such that no distributions from same

can be made without the express contemporaneous written consent of Mid State. Further, the USC Parties shall execute such documents as to the Account such that the Mid State Parties shall hold and maintain a fully perfected security interest as to the same and sums contained therein, including, without limitation "control" over same as contemplated by the UCC. After settlement and/or final resolution of all Project and Contract costs, expenses, liabilities and claims, the sums shall be distributed in light of USC's and Mid State's respective rights under this Agreement, the Contract and the Subcontract. The intent is that unless there is some cause for same to be paid to the Mid State Parties under the Subcontract, this Agreement or one of the documents executed in relation to the foregoing, then same should be distributed to USC as its entitlement under the Contract.

9.  All claims and disputes arising out of or relating to this Agreement, the Bonds, the Indemnity Agreements, the Contract, the Subcontract, the Sub-Agreements and/or the Project shall be subject to binding arbitration pursuant to the Construction Industry Rules of the American Arbitration Association, with the award subject to enforcement by any court with jurisdiction. The prevailing party shall be entitled to its attorneys' fees, costs and expenses and its arbitration fees, costs and expenses.

10. The addresses and tax identification numbers/social security numbers of the USC Parties are as follows:

> U.S. Coating Specialties & Supplies, Inc.
> Address: 125 West Mayes Street
> Jackson, MS  39283
> Tax Id. No.: _64088947_
>
> Earl Washington
> Address: _Earl Washington_
> _1655 Ashdown St. Johnson  ms_
> SSN: _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_

11. If any portion of this Agreement is or becomes unenforceable, this Agreement shall not be void, but shall be construed and enforced with the same effect as though such portion were omitted. The Mid State Parties shall be entitled to specific performance of the rights granted them under this Agreement and all of the obligations assumed by the USC Parties under this Agreement. Time is of the essence in this Agreement. This Agreement may be modified only in writing. If any USC Party fails to execute or improperly executes this Agreement or is otherwise found not to be bound under this Agreement, such failure or finding shall not effect the obligations of the other USC Parties. Termination or limitation of any USC Party's obligations shall in no way effect the obligations of the other USC Parties. This Agreement is binding upon and enforceable by the USC Parties and the Mid State Parties and their respective heirs, successors and assigns. The Mid State Parties may from time to time at their sole discretion act by or through one or more designees, including, but not limited to, Mid State Construction Company, Inc.

MIDSTATE
000814

WITNESS OUR SIGNATUARES effective as of the Effective Date.

U.S. COATING SPECIALTIES & SUPPLIES, LLC

By: _Earl Washington_
     Earl Washington
Title: _President_

_Earl Washington_
EARL WASHINGTON, Individually

MID STATE CONSTRUCTION COMPANY, INC.

By: _W.S._
     William S. Ware
     President

STATE OF _Mississippi_
COUNTY OF _Hinds_

    PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the said County and State, on this _22_ day of June, 2010, within my jurisdiction, the within named Earl Washington, who acknowledged that he is _president_ of U.S. Coating Specialties & Supplies, LLC, a Mississippi limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed he executed the above and foregoing instrument, after having been duly authorized by said limited liability company so to do.

                          _Mary W Dearld_
                          NOTARY PUBLIC

My Commission Expires:
_August 06, 2012_

STATE OF _Mississippi_
COUNTY OF _Hinds_

    PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the said County and State, on this ____ day of June, 2010, within my jurisdiction, the within named Earl Washington, who acknowledged that he executed the above and foregoing instrument.

                          _____
                          NOTARY PUBLIC

My Commission Expires:

_____

MIDSTATE
000812

STATE OF _Mississippi_
COUNTY OF _Madison_

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the said County and State, on this 24th day of June, 2010, within my jurisdiction, the within named William S. Ware, who acknowledged that he is President of Mid State Construction Company, Inc., a Mississippi corporation, and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after having been duly authorized by said corporation so to do.

NOTARY PUBLIC

My Commission Expires:
_4/23/12_

STATE OF MISSISSIPPI
ANNA NATION
ID No.
80322
NOTARY PUBLIC
Comm. Expires
April 23, 2012
MADISON COUNTY

6

MIDSTATE
000813

## AMENDED AND RESTATED AGREEMENT REGARDING BONDING CREDIT

This *Amended and Restated Agreement Regarding Bonding Credit* ("Agreement") is made effective as of November 18, 2010 (the "Effective Date") between and among U.S. Coating Specialties & Supplies, LLC ("USC"); Earl Washington ("Washington") (with USC and Washington sometimes herein collectively referred to as the "USC Parties"); and Mid State Construction Company, Inc. ("Mid State"). The "Premises" for this Agreement are as follows:

A.    USC has obtained and/or will obtain one or more bonds from Travelers Casualty and Surety Company of America (the "Surety") in relation to the ERDC Information Technology Laboratory Office Building and Computer Facility at the U.S. Army Engineer Research and Development Center in Vicksburg, MS (the "Project").

B.    The Surety provided same in reliance upon the indemnity agreements (collectively the "Indemnity Agreements") of Mid State, William S. Ware ("Ware") and P.G. Bernheim ("Bernheim") (with Mid State, Ware and Bernheim sometimes herein collectively referred to as the "Mid State Parties").

C.    As part of the overall arrangements between the parties, portions of the work for the Project shall be subcontracted to Mid State.

D.    The Mid State Parties are and/or will be willing (subject to the remaining terms of this Agreement) to assume the obligations to the Surety under each Indemnity Agreement, but only in exchange for the USC Parties' joint and several obligation of themselves as provided for in this Agreement.

E.    USC and Washington stipulate and agree that the benefits flowing to each of them, directly and indirectly, as a result of their affiliation with the Mid State Parties and the Project, are good and sufficient consideration for the obligations assumed by each of them under this Agreement.

F.    USC and Washington stipulate and agree that they enter into this Agreement as a material inducement to the Mid State Parties to proceed with the Indemnity Agreements, the procurement of bonds for the Project, and the entry into one or more subcontracts for the Project. USC and Washington further stipulate and agree that, but for their agreement to the terms hereof, the Mid State Parties would not proceed with same.

G.    The parties hereto previously executed that Agreement regarding Bonding Credit dated as of June 23, 2010 (the "Original Agreement"). This Agreement is an amendment to and restatement of, and not an extinguishment of, the obligations of the USC Parties under the Original Agreement.

NOW, THEREFORE, for and in consideration of the Premises, which are incorporated herein and made a part of this Agreement, the undersigned agree as follows:

1

MIDSTATE
000814

1. Mid State and USC shall work out acceptable terms for a subcontract (the "Subcontract") between Mid State and USC as to the Project. Once the Subcontract has been negotiated, agreed to and signed, Mid State shall then cause the Surety to issue the requisite payment and performance bonds (collectively referred to as the "Bonds") to the United States (the "Owner") for the contract (the "Contract") with the Owner for the Project. However, contemporaneously therewith the parties shall also execute the other agreements and instruments contemplated herein, including without limitation the "control" agreement as to the "Account" as referenced in Section 8 hereof.

2. As used in this Section 2, the term "Claims" shall mean any and all losses, damages, claims, assessments, penalties, liabilities, awards, lawsuits and costs (including attorneys' fees, costs and expenses) incurred or suffered by any one of the Mid State Parties in relation in whole or in part to the Indemnity Agreements and/or the Bonds. To the fullest extent allowed by law, the USC Parties jointly and severally agree to hold harmless, defend and indemnify each of the Mid State Parties as to any and all Claims; however, there shall be excluded from the foregoing indemnity obligation that part (but only that part) of Claims that arise only as a result of the acts or omissions of Mid State without any involvement in the underlying events by the USC Parties.

3. The USC Parties shall keep the Mid State Parties continually informed: as to the Contract; as to the Project; as to all subcontracts, purchase orders, and other agreements as to the Contract and the Project (with all said subcontracts, purchase orders and other agreements sometimes herein as a "Sub-Agreement"); and as to potential claims on the Bonds. The USC Parties will provide the Mid State Parties such information (documentary and otherwise) as the Mid State Parties request related to same. The Mid State Parties shall have the right, in their sole discretion, to determine for both themselves and for the USC Parties whether any claim on the Bonds and/or under the Contract should be paid, settled or compromised, and so long as they are made in good faith, such determinations shall be binding upon the USC Parties and the sums incurred by the Mid State Parties in relation to same shall be indemnified by the USC Parties as provided for above; however, the Mid State Parties shall consult with the USC Parties and attempt to agree on a course of settlement except where the circumstances justify unilateral action by the Mid State Parties, with the intent being that Mid State Parties would act unilaterally in settling claims only when the nature of the situation justifies it.

4. The following shall constitute a "Default":

   (a) any event of default under the Contract, under any Bond, under any Indemnity Agreement, the Subcontract, any other Sub-Agreement, and/or as to the Project;
   (b) any breach by USC of its obligations under and/or as to this Agreement, the Contract, the Subcontract, any other Sub-Agreement, any Bond, and/or as to the Project, which in the good faith opinion of the Mid State Parties may result in an event of default as described in subpart (a) hereof;
   (c) any breach by USC of its obligations under and/or as to this Agreement, the Contract, the Subcontract, any other Sub-Agreement, any Bond, and/or as to the Project, which in the good faith opinion of the Mid State Parties may result in any financial loss or losses as to one or more of the Contract, any Sub-Agreement, any

2

MIDSTATE
000815

Bond, and/or as to the Project, which financial loss(es) taken in the aggregate would exceed $50,000.00;

(d) failure of any USC Party to pay any amount or perform any covenant or obligation under this Agreement, the Contract, under any Bond, under any Indemnity Agreement, the Subcontract, any other Sub-Agreement, and/or as to the Project;

(e) the institution of proceedings by any USC Party under any state insolvency law or under any federal bankruptcy law or the institution of proceedings against any USC Party under any state insolvency law or under any federal bankruptcy law, if such proceedings are not dismissed within thirty (30) days;

(f) any USC Party's becoming insolvent or generally failing to pay its debts as they become due;

(g) the instigation of legal proceedings against any USC Party for the violation of a criminal statute or for failure to pay state or federal taxes;

(h) the issuance of a judgment against any USC Party in excess of $25,000 or an attachment of any property of any USC Party;

(i) any USC Party's liquidation or cessation of business; and/or

(j) the occurrence of a default under the terms of any loan agreement, security agreement, deed of trust, or similar document to which any USC Party is a party or to which any of their property is subject.

5. Upon the occurrence of a Default, the Mid State Parties shall have the right to: (a) take possession of the work under the Contract and to complete same, or cause, or consent to, completion thereof; (b) take over Sub-Agreements related to the Contract and/or the Project; (c) immediately take possession of the USC Parties' property related to the Project and/or the Contract and utilize same for completion of the Contract and/or the Project without payment for such use; (d) assert or prosecute any right or claim in the name of the USC Parties and settle same as the Mid State Parties see fit; (e) execute in the name of the USC Parties any instruments deemed necessary or desirable by the Mid State Parties to: (i) provide the Mid State Parties with title to assets, (ii) take immediate possession of funds as to the Contract and/or the Project whether earned or unearned, (iii) collect such sums as may be due the USC Parties and to endorse same in the name of the USC Parties, and (iv) collect on any negotiable instruments; (f) require any obligee (or the Surety) to withhold the payment of Contract funds until the Mid State Parties consent to the release of same; (g) be subrogated to all the rights, remedies, properties, funds, securities and receivables relating to the Contract and/or the Project; and/or (h) by written notice to USC, require the USC Parties to promptly (and in no event more than two (2) business days after such request) provide to the Mid State Parties cash collateral in an amount equal to 105% of the potential obligations of the Mid State Parties to the Surety under the Indemnity Agreements, as estimated by the Mid State Parties in their good faith business judgment (the "Cash Collateral"). The obligation of the USC Parties to fund the Cash Collateral shall be absolute, unconditional, and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement. The USC Parties hereby grant, assign, transfer and convey to the Mid State Parties all of the USC Parties' rights, title and interest in and to all assets and property of the USC Parties to the extent necessary to give the Mid State Parties the above rights in an event of Default. Further, in an event of Default and upon demand the USC Parties shall direct that all payments, monies, and properties that are due or may become due on the Contract and/or the

3

MIDSTATE
000816

Project be made payable to the Mid State Parties, and/or sent directly to the Mid State Parties, and shall issue whatever notices or writings as deemed necessary by the Mid State Parties to give the Mid State Parties the full benefit of the foregoing.

6.  Each of the USC Parties hereby irrevocably constitute, appoint and designate each of the Mid State Parties as the USC Parties' attorney in fact with the right, but not the obligation, to exercise all rights of the USC Parties assigned or granted to the Mid State Parties and to execute and deliver any other assignments, documents, instruments or agreements deemed necessary by the Mid State Parties to exercise the Mid State Parties' rights under this Agreement in the name of any USC Party.

7.  As security for their obligations hereunder, the USC Parties hereby grant to the Mid State, for the benefit of itself and the other Mid State Parties, a security interest in the following properties, assets and rights of the USC Parties, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof: all Cash Collateral, goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, subcontracts, purchase orders, agreements, accounts, chattel paper, deposit accounts (including the Account defined below), letter-of-credit rights, securities and all other investment property, supporting obligations, the Contract any and all Contract and/or Project rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (with all of the foregoing collectively referred to as the "Collateral"). This Agreement shall for all purposes constitute a security agreement for the benefit of the Mid State Parties in accordance with the Uniform Commercial Code ("UCC") and all similar statutes. Each Mid State Party shall have all rights and remedies of a "secured party" under the UCC. The USC Parties hereby irrevocably authorize the Mid State Parties, without notice to any of the USC Parties, in order to perfect the security interest granted herein, to file either: (a) this Agreement or a copy or reproduction thereof; or (b) any initial financing statements or amendments thereto that indicate the Collateral. Likewise, the USC Parties shall execute such further documents and take such further action as the Mid State Parties request to give full and perfected effect to the foregoing.

8.  Notwithstanding and in addition to the foregoing, the USC Parties shall execute such documents as are necessary to cause an assignment of all Contract proceeds such that all such proceeds are paid directly into account number 050006640 with Trustmark National Bank (the "Account"), and to cause such Account to be restricted such that no distributions from same can be made without the express contemporaneous written consent of Mid State. Further, the USC Parties shall execute such documents as to the Account such that the Mid State Parties shall hold and maintain a fully perfected security interest as to the same and sums contained therein, including, without limitation "control" over same as contemplated by the UCC. After settlement and/or final resolution of all Project and Contract costs, expenses, liabilities and claims, the sums shall be distributed in light of USC's and Mid State's respective rights under this Agreement, the Contract and the Subcontract. The intent is that unless there is some cause for same to be paid to the Mid State Parties under the Subcontract, this Agreement or one of the documents executed in relation to the foregoing, then same should be distributed to USC as its entitlement under the Contract.

4

MIDSTATE
000817

9. All claims and disputes arising out of or relating to this Agreement, the Bonds, the Indemnity Agreements, the Contract, the Subcontract, the Sub-Agreements and/or the Project shall be subject to binding arbitration pursuant to the Construction Industry Rules of the American Arbitration Association, with the award subject to enforcement by any court with jurisdiction. The prevailing party shall be entitled to its attorneys' fees, costs and expenses and its arbitration fees, costs and expenses.

10. The addresses and tax identification numbers/social security numbers of the USC Parties are as follows:

> U.S. Coating Specialties & Supplies, LLC
> Address: 125 West Mayes Street
> Jackson, MS 39283
> Tax Id. No.: 640889471
>
> Earl Washington
> Address: 1655 Ashdown Street
> Jackson, MS
> SSN: _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

11. If any portion of this Agreement is or becomes unenforceable, this Agreement shall not be void, but shall be construed and enforced with the same effect as though such portion were omitted. The Mid State Parties shall be entitled to specific performance of the rights granted them under this Agreement and all of the obligations assumed by the USC Parties under this Agreement. Time is of the essence in this Agreement. This Agreement may be modified only in writing. If any USC Party fails to execute or improperly executes this Agreement or is otherwise found not to be bound under this Agreement, such failure or finding shall not effect the obligations of the other USC Parties. Termination or limitation of any USC Party's obligations shall in no way effect the obligations of the other USC Parties. This Agreement is binding upon and enforceable by the USC Parties and the Mid State Parties and their respective heirs, successors and assigns. The Mid State Parties may from time to time at their sole discretion act by or through one or more designees, including, but not limited to, Mid State Construction Company, Inc.

5

MIDSTATE
000818

WITNESS OUR SIGNATUARES effective as of the Effective Date.

U.S. COATING SPECIALTIES & SUPPLIES, LLC

By: _Earl Washington_
    Earl Washington
Title: _President_

_Earl Washington_
EARL WASHINGTON, Individually


MID STATE CONSTRUCTION COMPANY, INC.

By: _W. Burnham_
    William S. Ware P.C. - BURNHAM
   ✓ President

STATE OF Mississippi
COUNTY OF Madison

    PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the said County and State, on this 22ᴬᴰ day of November, 2010, within my jurisdiction, the within named Earl Washington, who acknowledged that he is Pres.conn of U.S. Coating Specialties & Supplies, LLC, a Mississippi limited liability company, and that for and on behalf of the said limited liability company, signed, as its act and deed he executed the above and foregoing instrument, after having been duly authorized by said limited liability company so to do.

                                       _Anna Cahone_
                                       NOTARY PUBLIC

My Commission Expires:
4/23/2012

STATE OF Mississippi
COUNTY OF Madison

    PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the said County and State, on this _____ day of _November_, 2010, within my jurisdiction, the within named Earl Washington, who acknowledged that he executed the above and foregoing instrument.

                                      _Anna Cahone_
                                  NOTARY PUBLIC

My Commission Expires:
4/23/2012

6

STATE OF _Mississippi_
COUNTY OF _Madison_

     PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the said County and State, on this ___ day of _November_, 2010, within my jurisdiction, the within named William S. Ware, who acknowledged that he is President of Mid State Construction Company, Inc., a Mississippi corporation, and that for and on behalf of the said corporation, and as its act and deed he executed the above and foregoing instrument, after having been duly authorized by said corporation so to do.

NOTARY PUBLIC

My Commission Expires:
_4/23/2012_


STATE OF MISSISSIPPI
ANNA NATIONS
ID No. 80322 NOTARY PUBLIC
Comm. Expires
April 23, 2012
MADISON COUNTY

7

MIDSTATE
000820

## NOTICE OF ASSIGNMENT

To: _____ [Address to one of the parties specified in 32.802(e)][(1) the contracting officer or the head of his department or agency, and (2) the disbursing officer, if any, designated in such contract to make payment].

This has reference to Contract No. W912BE-10-C-0019 dated June 21, 2010, entered into between U.S. Coating Specialties & Supplies, LLC and _____ [Government agency, name of office, and address], for ERDC Information Technology Laboratory Office Building and Computer Facility at the U.S. Army Engineer Research and Development Center in Vicksburg, MS.

Moneys due or to become due under the contract described above have been assigned to the undersigned under the provisions of the Assignment of Claims Act of 1940, as amended, 31 U.S.C. 3727, 41 U.S.C. 15.

A true copy of the instrument of assignment executed by the Contractor on November ____, 2010, is attached to the original notice.

Payments due or to become due under this contract should be made to the undersigned assignee.

Please return to the undersigned the three enclosed copies of this notice with appropriate notations showing the date and hour of receipt, and signed by the person acknowledging receipt on behalf of the addressee.

Very truly yours,

U.S. Coating Specialties & Supplies, LLC

By: _Earl Washington_

    Earl Washington

Title: _President_

Assignee:
Trustmark National Bank

_____
Jackson, Mississippi 39____

Surety:
Travelers Casualty and Surety Company of America

_____
_____

### ACKNOWLEDGEMENT

MIDSTATE
000821

DATE: 11/19/2010

This Subcontract is made between U S Coating Specialties & Supplies LLC, hereafter called the Contractor, and Subcontractor as listed below.

JOB NUMBER/PHASE NUMBER: W912EE-10-C-0019

SUBCONTRACTOR:

OWNER/ARCHITECT/ENGINEER:

Mid State Construction Company, Inc.
300 Briarwood West Dr.
Jackson, MS 39206

Owner: US Army Corp of Engineers

Architect: US Army Corp of Engineers

Contact:    William S. Ware, President/CEO
Phone:      (601) 956-9500

Engineers: US Army Corp of Engineers

EIN:        #64-00428577

PROJECT NAME & LOCATION:
EDRC ITL Office Building and Technology Facility
Vicksburg, MS
Owner: U S Army Corp of Engineers

SCOPE OF SUBCONTRACT WORK: The above-named Subcontractor shall furnish all labor, materials, tools, equipment, facilities, supervision, management, services, shop drawings, submittals, testing, and other items specified for the proper execution and shall make all installations and connections specified to perform fully and to complete in every respect the Subcontract work described as follows:

- Divisions 2 – Site Work/Demolition - $730,080.00,
- Division 3 – Concrete - $1,071,792.00,
- Division 5 –Steel - $1,278,757.00,
- Division 7 – Thermal and Moisture Protection-$1,133,372.00,
- Division 10 – Specialties - $102,643.00,
- Division 11 – Equipment - $3,885.00,
- Division 12 – Furnishings - $4,650.00
- Division 16 – Electrical - $1,236,550.00, and
- Bond Fee and Insurance Agreement - $822,763.00 (See Exhibit "I")  *$211,044.00 EW/OM*

Exhibit "A" through "I" is attached hereto and form a part of this agreement.

SUBCONTRACT AMOUNT:    Five million-eight hundred-eighty-four thousand-one hundred-ninety-two dollars ($5,884,492.00).

(Subcontractor's price includes performance of all Subcontract work for the Project in accordance with the terms and conditions set forth herein)

## ARTICLE I: GENERAL OBLIGATIONS

1.0 Subcontractor shall be bound to the Contractor by all terms and conditions of this Subcontract and, except as otherwise provided herein, by all terms and conditions of the Prime Contract between the Owner and Contractor, which is incorporated by reference into this Subcontract and is an integral part of this Subcontract. The Prime Contract includes, but is not limited to, the Agreement between the Contractor and the Owner; all general, supplementary, special conditions; all drawings, specifications,

1

details, and standards; all addenda, modifications, and revisions to any of the foregoing; and all other documents or requirements incorporated into or referenced by the foregoing. Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the Contractor, by the Prime Contract, assumes toward the Owner. Subcontractor shall have the same rights as against Contractor as the Contractor has against the Owner. In the event of an ambiguity, inconsistency, or conflict in payment or other provisions between or among the Prime Contract, this Subcontract, any bond, and/or other agreement or instrument, this Subcontract shall govern. In no event shall Subcontractor be entitled to greater rights, higher entitlements, or more relief against the Contractor than the Contractor actually obtains from the Owner on Subcontractor's behalf with respect to the Subcontract work; however, the foregoing limitation shall apply only to the extent that as to the claim in question the Contractor's liability exists solely because of the acts or omissions of the Owner.

1.1 Subcontractor shall perform its work in accordance with this Subcontract and with the Prime Contract. All work of Subcontractor shall be subject to the approval of the Architect, Owner, and any authorities having jurisdiction over the Subcontract work. Subcontractor's work includes all work specifically set forth in this Subcontract and covered by parts of the Prime Contract applicable thereto. All provisions of this Subcontract and of all incorporated, referenced, and attached documents, including but not limited to the Prime Contract, shall be construed together and harmonized to the extent reasonable and consistent with the intent of this Subcontract for proper completion and functioning of the entire scope of work being subcontracted.

1.2 Subcontractor shall promptly prepare and submit to Contractor such drawings, details, product data, samples and other submittals as may be required by the Prime Contract as to the Subcontract work.

1.3 Subcontractor represents and warrants that it is fully qualified and experienced to perform the work and that it is properly licensed, equipped, and organized to perform such work. Subcontractor further certifies that it has reasonably acquainted itself with job site conditions that may affect the cost or timeliness of Subcontractor's performance.

1.4 Subcontractor is responsible for the proper location and layout of its work. Before beginning any portion of the work, Subcontractor shall take reasonable efforts to detect and report in writing any condition or problem caused by others which could affect Subcontractor's work.

1.5 Subcontractor and Contractor agree and acknowledge that meetings will be held at the jobsite as called for by the Contractor, or the Subcontractor, or as otherwise required herein. Attendance by Subcontractor and Contractor is required each meeting.

1.6 No temporary office building, storage trailer, sign, or other structure shall be placed on the jobsite by Subcontractor unless approval of the location, design and painting thereof has first been received from the Contractor, which approval shall not be unreasonably withheld.

1.7 Subcontractor shall clean up and remove from the site and dispose of trash and debris as to its work on a routine basis.

1.8 Subcontractor shall provide sufficient, safe and proper facilities, equipment, and working conditions, which shall, at reasonable times, be subject to inspection by Contractor, the Owner, or their representatives.

1.9 Subcontractor agrees to provide such "as-built" drawings, maintenance and operation manuals, etc., as may be required in the Subcontract. If requested by Contractor, Subcontractor shall also provide the Contractor daily reports indicating work performed and manpower for the previous day.

## ARTICLE II: BONDING OF SUBCONTRACTOR

2.0 Subcontractor shall not be obligated to provide any bonds for this Project at the subcontract level.

MIDSTATE
000703

## ARTICLE III: RELATIONSHIP WITH CONTRACTOR

3.0 Subcontractor shall have a competent and experienced superintendent at the Project at all times while Subcontractor's work is or should be in progress and as otherwise necessary to ensure full performance of all obligations under this Subcontract. Subcontractor's superintendent shall have the authority to act for and on behalf of Subcontractor in all matters relating to Subcontractor's work. Subcontractor shall do, without additional charge, whatever is necessary in the performance of this Subcontract or whatever the Contractor directs to ensure harmonious labor relations at the Project and to prevent strikes, disputes, and violation of labor agreements, labor laws, and labor regulations.

3.1 Subcontractor shall designate a quality control representative who shall have authority to act for and on behalf of Subcontractor in all matters related to the quality of Subcontractor's work. Subcontractor shall fully comply with the Contractor's quality assurance plan.

3.2 Subcontractor shall enforce strict discipline and good order among its employees. Subcontractor shall report in writing to the Contractor within twenty-four (24) hours an injury to an employee or agent of Subcontractor or any other liability claim whatsoever that occurred at the site or connected with Subcontractor's work.

3.3 Subcontractor is in all respects an independent contractor and is not an agent of the Contractor. No personnel employed by Subcontractor shall be deemed under any circumstances to be agents, representatives or employees of Contractor. Subcontractor shall have no authority to bind the Contractor by any representation, promise, or statement of any kind without first obtaining the Contractors specific written consent and authorization. Subcontractor agrees not to enter into any other contract relating to the Project without the Contractors prior written consent.

3.4 Subcontractor shall not interfere with the Contractor's relationship with the Owner, and Subcontractor shall not deal directly with the Owner, Engineer, or the Architect without prior written authorization in each instance from an Authorized Representative of the Contractor. Specifically, without limiting the generality of the foregoing, Subcontractor shall not negotiate directly with the Owner for any addition(s), deletion(s), or alteration(s) on the Project covered hereunder.

## ARTICLE IV: TIME

4.0 Time is of the essence. Subcontractor and Contractor shall perform their obligations in accordance with the mutually agreed schedule. The Contractor shall have the responsibility to coordinate Subcontractor's work with the work of others, and the Subcontractor shall have the obligation to reasonably cooperate with the Owner's scheduling and coordination requests. Both parties shall perform their respective obligations so as to not delay the other.

4.1 Each party shall be responsible for compensating the other party for all damages suffered or incurred as a result of delays or interference.

4.2 If Subcontractor falls behind the Contractor's schedule for Subcontractor work or if, in the opinion of the Contractor, Subcontractor is otherwise not maintaining a satisfactory rate of progress as determined by the Contractor, the Contractor may direct Subcontractor to take such action as the Contractor deems necessary or appropriate to improve Subcontractor's rate of progress including, but not limited to, increasing the number of superintendents, foremen, skilled labor, and unskilled labor, increasing the number of crews, increasing the number of shifts, employing more or better equipment, working overtime, expediting delivery of materials, substituting materials, changing sequence of performance, prosecuting parts of Subcontract work in preference to other parts, and any other increase or acceleration of effort, all of which shall be performed by Subcontractor at no cost to the Contractor. In addition to the foregoing, the Contractor shall have the right, but not the obligation and without prejudice to any other right or remedy, to provide, either with Contractor's own forces or with others, any additional labor, materials, equipment, supervision, or other item and to take such further actions as the Contractor deems necessary or appropriate, which shall be at Subcontractors cost and which the Contractor shall be entitled to deduct

3

**MIDSTATE**
**000704**

from any payment, whether then due or thereafter to become due to Subcontractor. The Contractor's administrative and overhead expenses will be included in this cost. The Contractors decisions and directives under this paragraph shall be final and binding.

4.3 If Subcontractor or sub-subcontractor(s) under Subcontractors division(s) of work fall behind the Contractors schedule and is unable to get back on Contractors schedule after the above remedies in sec. 4.2 fail, and the delay puts the Contractor's schedule beyond the time specified in the Contractors contract, and the Government assesses Liquidated Damages to the Contractor, then this delay will be charged to the Subcontractor as Liquidated Damages in the amount of $1,354 per day for each calendar day of delay until the work in question is completed and accepted by Government.

4.4 Contractor may, with or without cause, order Subcontractor to stop or suspend all or any part of the work under this Subcontract for such time as may be determined to be appropriate for the convenience of Contractor, but only to extent that the Owner has given such instructions to the Contractor as to the work in question. The Subcontractor shall be entitled to an equitable adjustment of the Subcontract time/schedule and the Subcontract price for impacts from any such suspension; however, they shall not be adjusted for any suspension to the extent that suspension was caused by the fault or negligence of Subcontractor.

## ARTICLE V: TERMINATION

5.0 Subcontractor shall be deemed in default, if at any time, Subcontractor shall: (a) persistently refuse or fail to prosecute Subcontract work in a diligent, timely, workmanlike, skillful, cooperative, safe, and careful manner, (b) fail to supply sufficient, adequate or competent supervision, (c) fail to furnish a sufficient number of properly skilled workmen, (d) fail to have at the Project sufficient materials and equipment of the proper quality and quantity, (e) fail to promptly correct defective work, (f) fail to promptly pay its bills and discharge its obligations on this Project or otherwise, (g) fail to perform any term or condition of any part of Subcontract, all of which are material, or (h) otherwise delay the work of the Contractor or other subcontractors. The parties acknowledge that each of the forgoing may under appropriate circumstances constitute a material breach of Subcontract. After written notice to Subcontractor to remedy such breach or breaches, Subcontractor shall promptly remedy such breach or breaches in such manner and with such diligence and promptness as may be required by the circumstances. Upon Subcontractor's failure to cure a material breach and following at least seven days' prior written notice, the Contractor may terminate this Subcontract in whole or in part and may take possession of all drawings and materials on site and belonging to Subcontractor as may be deemed necessary or desirable to complete the Subcontract work.

5.1 Subcontractor shall have the right to terminate this Subcontract for any material breach by the Contractor, but only after first having given seven days' written notice of the material breach (unless the emergency nature of the circumstances justify lesser notice). Without limitation on what constitutes a material breach, it is specifically agreed that the Contractor's failure to pay sums when due shall constitute a material breach and default. Further, it is agreed that all of Contractor's obligations hereunder are material obligations.

5.2 If either party (herein referred to as the "Bankrupt Party") institutes or has instituted against it a case under the United States Bankruptcy Code, such event is presumed to impair or frustrate the other party's (herein referred to as the "Remaining Party") ability to perform its obligations under this Subcontract. Within ten (10) days after the Remaining Party's request, the Bankrupt Party (or its trustee, successor, or other party acting for it) shall deliver to the Remaining Party adequate assurance of the Bankrupt Party's ability to perform all material obligations under the Subcontract. Additionally, the Bankrupt Party shall file, at the earliest time permitted by law, an appropriate action for assumption or rejection of the Subcontract and the Bankrupt Party shall diligently pursue such action. If the Bankrupt Party fails to comply strictly with the foregoing obligations, the Remaining Party shall be entitled and is hereby authorized to request the Bankruptcy Court to reject the Subcontract, to declare the Subcontract terminated, and to permit the Remaining Party to pursue any other recourse or remedies available. The rights and remedies under this section are not intended and shall not be construed to limit any other rights and remedies of the

4

MIDSTATE
000705

Remaining Party under this Subcontract or as otherwise afforded by law, including the Remaining Party's entitlement to seek relief from any automatic stays under the Bankruptcy Code and from any order of a court of competent jurisdiction. In particular, the Remaining Party shall be entitled to assert all rights and remedies against any bond or policy of insurance furnished by the Bankrupt Party, notwithstanding any case instituted by or against the Bankrupt Party under the Bankruptcy Code.

5.3 Each party shall be entitled to all damages it suffers as a result of any breach by the other party, including all damages and losses incurred following a termination.

5.4 Each party shall be entitled to reasonable overhead and profit on all sums it expends in curing breaches by the other party.

5.5 The Contractor shall have the right to terminate this Subcontract without fault of Subcontractor but only to extent that the Owner has made such a termination as to the Contractor as to the work in question. In the event of such no fault termination, Subcontractor shall be entitled to payment, as its sole and exclusive remedy, for the most equitable (under the circumstances) of the following: (1) the Subcontract value of all work performed and for all materials and equipment stored on site or in transit, which are not saleable in Subcontractor's ordinary course of business and which Subcontractor can transfer to the Contractor free of any liens or encumbrances or (2) the reasonable, actual direct costs for such work plus a single allowance, not to exceed fifteen percent (15%), for both overhead (including job site and home office) and profit on such costs.

## ARTICLE VI: COMPLIANCE WITH LAWS

6.0 Subcontractor shall perform the Subcontract work in a safe and proper manner and shall comply with all laws, ordinances, building codes, safety requirements, and regulations of whatever nature that apply to this Subcontract, including but not limited to OSHA. Subcontractor shall give adequate notices pertaining to the work of Subcontractor to proper authorities and secure and pay for all necessary licenses and permits to carry on Subcontractor's work. Subcontractor is responsible for all inspection requirements and regulations of all governmental agencies and authorities, including OSHA, with respect to Subcontractor's work and shall pay any fine(s) (including those which may be assessed against the Contractor) and other expenses (including, but not limited to Contractor's attorneys' fees) which may be attributable to Subcontractor's failure to comply with any regulation.

6.1 Subcontractor shall employ labor, make purchases and transact its business without discrimination as to race, color, gender, creed, or religion and also without discrimination as to whether employees of the Contractor, other subcontractors, material suppliers, or other entities involved in the Project are members or are not members of any labor union or other labor organization. Subcontractor agrees to comply with all laws, including but not limited to, Executive Order 11246, if applicable. If required by Contractor or Owner, Subcontractor agrees to meet any minority goals.

6.2 Subcontractor has full and exclusive liability for all contributions, taxes, deposits, and payments required of employers by federal, state, or local governments, with respect to wages, salaries, remuneration, or benefits paid or owed by Subcontractor to any of Subcontractor's employees or others who perform work or render services for Subcontractor in connection with this Subcontract. Subcontractor has exclusive liability for all income, gross receipts, sales, use, or other taxes applicable to Subcontractor's work and to any item furnished or employed, any expense incurred, all work performed, and all revenue earned by Subcontractor pursuant this Subcontract. In the event the Contractor is held liable to pay any such tax or contribution on behalf of Subcontractor, Subcontractor agrees to supply the Contractor with all records necessary to compute the same and to fully reimburse the Contractor upon demand for the amount thereof (including penalties and interest) paid by the Contractor; the Contractor shall have the further right to deduct any amount so paid, plus attorneys' fees and a reasonable overhead expense from any sums due Subcontractor by the Contractor on this or any other project.

6.3 Subcontractor bears full and exclusive responsibility and liability for the proper discovery, identification, reporting, handling, removal, and disposal, whether on site or off site, of all materials

5

MIDSTATE
000706

encountered, used, or generated in the performance of the Subcontract work which are defined or considered as hazardous by federal, state or local authorities having jurisdiction over the Project, and Subcontractor shall comply with all laws, regulations, standards, and safety requirements with respect to such hazardous materials. If Subcontractor fails to comply with its responsibilities under this paragraph, the Contractor may perform such work with Contractor's forces or through others at the expense of Subcontractor.

## ARTICLE VII: PAYMENT

7.0 Subcontractor shall furnish such evidence as the Contractor may reasonably require as proof of payment of all obligations due and owing in connection with this Subcontract including, but not limited to, sworn statements showing all parties who furnish labor, materials, or services, to Subcontractor with their names, addresses, and amount due or to become due each. Like statements may be required of subcontractors, vendors, suppliers, etc. of Subcontractor. However, all the foregoing documentation may be in a form which is conditional upon corresponding payment from the Contractor to the Subcontractor, and nothing in the foregoing or anywhere else in this Subcontract shall limit Subcontractor's right to make payment by the Contractor for the sums in question a condition precedent to any obligation on the part of the Subcontractor to have any payment obligation to its subcontractors, vendors, suppliers, etc.

7.1 Contractor shall pay Subcontractor progress payments based upon work completed/approved and materials stored/supplied per the Subcontractor's schedule of values included with Subcontractor's applications for payment. Subcontractor shall submit applications for payment on no less than a monthly basis. Contractor shall on at least a monthly basis include the items covered in Subcontractor's applications for payment in Contractor's payment requests to the Owner. Contractor shall submit its payment requests to the Owner for a month by no later than the tenth day of the following month. Contractor shall make its progress payments to the Subcontractor for said work completed and materials on the earlier of the following: (1) by no later than the 30th day of said following month; or (2) the day when the Owner pays Contractor for said labor and materials.

7.2 Subcontractor agrees to submit to Contractor applications for payment in such reasonable time as to enable Contractor to apply for payment as provided in the Prime Contract. Should Subcontractor's portion of the Contractor's application be reduced or denied for any reason, Contractor's payment to Subcontractor will be reduced or denied accordingly.

## ARTICLE VIII: LIENS

8.0 Subcontractor shall submit to Contractor a proper Release of Lien, within 5 working days after each payment received, indicating Contractor's payment to Subcontractor and Subcontractor's payment of all of its sub-subcontractor(s) working under its division(s) of work having been paid in full for the submitted pay request.

## ARTICLE IX: INSURANCE

9.0 Subcontractor shall obtain, before commencement of work, and shall maintain until final acceptance of the Subcontract work, insurance coverage at the same policy limits which are specified by the Prime Contract.

9.1 Contractor shall carry builders' risk for the work of the Project as a whole, and shall provide proof of such coverage to Subcontractor.

## ARTICLE X: PROTECTION OF WORK

10.0 Subcontractor shall effectually secure and protect the work done hereunder against hazards under Subcontractor's reasonable control.

6

**MIDSTATE**
**000707**

10.1 If Subcontractor damages the work of another subcontractor or the equipment or property of Owner, Contractor will issue a backcharge to Subcontractor for an adjustment in the Subcontract price to reflect the costs to correct the damage. If Contractor or some other subcontractor damages the work of Subcontractor or the equipment or property of Subcontractor (or its sub-subcontractors or suppliers), the Contractor shall issue a change order equitably adjusting the Subcontract time/schedule and the Subcontract price.

## ARTICLE XI: INDEMNIFICATION

11.0 The Contractor shall hold harmless, defend and indemnify Subcontractor for all losses, claims, liabilities, demands, judgments, fines and penalties suffered by Subcontractor to the extent they arise out of the negligence or breaches of the Contractor.

11.1 The Subcontractor shall hold harmless, defend and indemnify Contractor for all losses, claims, liabilities, demands, judgments, fines and penalties suffered by Contractor to the extent they arise out of the negligence or breaches of the Subcontractor.

## ARTICLE XII: CHANGES

12.0 Subcontractor shall make any and all changes in the work described in the Subcontract as directed by Contractor but only to extent that the Owner has given such instructions to the Contractor as to the work in question. Such change or written direction shall not invalidate this Subcontract. Changes may be additive or deductive. If there is a dispute as to whether the work at issue is a change in Subcontractor's work or there is a dispute as to the value of such change, Contractor shall be entitled to issue a directive to Subcontractor to perform the work in question and Subcontractor shall be obligated to proceed with and complete performance of such work, without either party waiving its respective rights. The Subcontract time/schedule and the Subcontract price shall be equitably adjusted for all changes. In the event there exists an opportunity to provide savings to the Owner through the process of Value Engineering, and the Subcontractor participates in this process, the resulting income paid by the Owner as a percentage of savings will be shared by Subcontractor and Contractor alike. That share of income shall be divided 50/50.

12.1 In the manner and form and in such detail as required by the Prime Contract, Subcontractor shall give written notice of any changes, cost reimbursement, additive or deductive adjustment in Subcontract time or amount, additional compensation, or other claim of any kind, at least five (5) working days (if possible and reasonable) before the time the Prime Contract requires the Contractor to give notice of same to the Owner. The Contractor shall give the Subcontractor notice of all claims by the Contractor within five (5) working days of the time that the Contractor knew or should have known of the claim, and said notice shall provide all pertinent details as to the claim. Both parties shall have the right to demand supplemental information as to claims, and both parties shall have the obligation to reasonably supplement their notices and documentation as to their respective claims. Both parties shall give the other such reasonable access to information as is necessary or appropriate to review and evaluate claims.

12.2 If the Owner requires certification of any claim or the submission of cost or pricing data respecting any change or alteration, Subcontractor covenants and agrees to furnish Contractor with a certification of any and all of Subcontractor's claims and of Subcontractor's cost or pricing data. Subcontractor's certification shall be in a form satisfactory for the purposes of the Prime Contract.

12.3 No change, alteration, or modification to or deviation from the work described in this Subcontract, whether made in the manner provided in this section or not, shall release or exonerate, in whole or in part, any bond or any surety on any bond given in connection with this Subcontract, and no notice is required to be given to such surety of any such change, alteration, modification, or deviation. Any increases in the Subcontract price shall automatically increase the respective penal sums of the performance bond and of the payment bond furnished by Subcontractor; however, the penal sum shall not decrease in the event of a decrease in Subcontract price.

7

MIDSTATE
000708

## ARTICLE XIII: WARRANTY

13.0 Subcontractor hereby guarantees and warrants its work shall comply with all parts of the Prime Contract applicable to Subcontractor's work and with all warranties as to same required therein.

## ARTICLE XIV: DISPUTE RESOLUTION

14.0 This Subcontract shall be deemed entered into in Jackson, Mississippi, upon execution by the parties. The laws of the State of Mississippi govern this Subcontract. All claims and disputes arising out of or relating to this Subcontract or this Project shall be subject to binding arbitration pursuant to the Construction Industry Rules of the American Arbitration Association, and administered by the American Arbitration Association, with the award subject to enforcement by any court with jurisdiction.

14.1 If Contractor and Subcontractor litigate or arbitrate a monetary claim, not otherwise prohibited by this Subcontract, the party found liable in such proceedings will pay the other party's reasonable and necessary attorneys' fees.

14.2 No claim, dispute, or matter in controversy or question shall interfere with the progress of construction, and both parties shall proceed diligently with performance of this Subcontract, notwithstanding the existence of any claim, dispute, or matter in controversy or question.

## ARTICLE XV: NOTICES

15.0 Any notice provided for herein may be given in writing by United States mail, and shall be considered as given when addressed to the last known address of the other party and deposited in the United States mail, and shall be effective for all purposes, as of the time of such deposit, whether actually received or not. Notice by any other means shall be effective when communicated to or received.

## ARTICLE XVI: ASSIGNMENT

16.0 Subcontractor shall not subcontract nor assign any part of this Subcontract without first obtaining the written consent and approval of the Contractor (which consent shall not be unreasonably withheld); however, this restriction shall not limit subcontracting in the ordinary course of business. Assignments of Subcontract proceeds are permissible but only if written notice of same is received and acknowledged in writing by an Authorized Representative of Contractor at least thirty (30) days before the assigned proceeds are due and payable to Subcontractor. Subcontractor and Subcontractor's assignee shall ensure that the assignment of Subcontract proceeds does not adversely affect the performance of this Subcontract, including the full and timely payment of all bills and obligations owed by Subcontractor. To the extent Subcontractor proceeds are paid to Subcontractor's assignee Subcontractor and Subcontractor's assignee hereby agree to indemnify, defend, save harmless, and exonerate the Contractor from any loss, liability, or expense (including attorney's fees) which the Contractor incurs or which is claimed against either the Contractor or the Contractor's surety as a result of Subcontractor's failure to perform work in accordance with the Subcontract or as a result of Subcontractor's failure to pay its bills and discharge its obligations relating to this Subcontract. Any assignments of Subcontract proceeds and any payments made pursuant to assignments shall be subject to and conditioned upon Subcontractor's compliance with all terms and conditions of this Subcontract and any payments under such assignments are expressly conditioned upon and restricted to the amount actually collected by Contractor from the Owner for work performed by Subcontractor and accepted by the Owner, less retainage, backcharges, or other offsets which are chargeable by Contractor against Subcontractor, whether on this Project or otherwise. Acknowledgment, acceptance or approval of an assignment by the Contractor does not constitute any representation or agreement by Contractor that Subcontractor is owed the amount assigned or any specific amount whatsoever.

## ARTICLE XVII: INTERPRETATION

8

MIDSTATE
000709

17.0 This Subcontract, and all documents incorporated by reference herein, represent the entire and integrated agreement between the parties and supersedes all prior negotiations, representations, proposals, stipulations, or agreements, either written or oral; however, the foregoing relates only to this subcontracting of the work in question, and does not limit or effect all the other separate written agreements among and between one or more of the parties (and others) as to the Project, including specifically but not by way of limitation the agreement regarding bonding credit and the agreement(s) as to assignment and the like as to the Prime Contract proceeds, which, notwithstanding any language anywhere herein, shall remain in full force and effect pursuant to all the terms thereof.

17.1 The terms and provisions of this Subcontract will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Subcontract, as applied to any party or to any circumstances, is adjudged by a court or arbitrator not to be enforceable in accordance with its terms, the parties hereto agree that it is their desire that that the court or arbitrators making such determination modify the provision, including, without limitation, deleting specific words or phrases, in a manner consistent with its objectives, and its modified form, such provision will then be enforceable and will be enforced. It is the intent of the parties hereto that the court or arbitrators, in determining any such enforceable modified provision, recognize that it is their intent that the provisions hereof be imposed and maintained to the greatest extent possible.

The terms and conditions hereof shall inure to and be binding upon the parties hereto, their successors, assigns, executors, administrator, and legal representatives.

This Subcontract cannot be amended, changed, modified or altered except in writing signed by an Authorized Representative of Contractor.

No waiver or failure by the Contractor to exercise rights under this Subcontract shall limit any of the Contractor's rights as to any subsequent or continuing failure by Subcontractor to comply strictly with all terms and conditions of this Subcontract.

In the event of any mistake, ambiguity, or conflict with this Subcontract neither party shall be considered the author of the Subcontract, and no mistake, ambiguity, or conflict shall be construed more strongly against or more favorably toward either party hereto.

Headings used in this Subcontract are inserted only as a matter of convenience and for reference, and the in no way define, limit or describe the scope or intent of this contract, nor do they in any way affect this contract.

Nothing is this Subcontract is intended nor shall be confused to create any rights for or to the benefit of any third parties.

## ARTICLE XVIII: AUTHORIZED REPRESENTATIVES

The Contractor's Authorized Representative shall be:

Name:  Earl Washington          Title:  President/CEO          Phone: (601)981-8986

Subcontractor's Authorized Representative for the Project shall be:

Name:  William S. Ware          Title:  President/CEO          Phone: (601) 956-9500

The following have agreed to the terms of this Subcontract and have signed this Subcontract as officers of their respective organizations, having been duly authorized to do so.

SUBCONTRACTOR:                              CONTRACTOR:

9

MIDSTATE
000710

Mid State Construction Company, Inc.
300 Briarwood West Dr.
Jackson, MS 39206

By: P.G. Bernheim
Title:    Executive Vice President
Federal ID or SSN: #64-00428577
License Number:

EQUAL OPPORTUNITY EMPLOYER
M/F   H/V

U.S. Coating Specialties & Supplies, LLC
125 West Mayes Street
Jackson, MS 39213

By: Earl Washington
Title: President/CEO

10

MIDSTATE
000711

## AGREEMENT FOR BOND PREMIUM AND
## BUILDERS' RISK INSURANCE

Mid-State Construction Company, Inc. agrees to arrange for bonding ~~and~~

~~builders' risk insurance~~ for which U.S. Coating Specialties & Supplies, LLC agrees to

pay as follows:

Performance and Payment Bonds     $311,044
(Including Bid Option No. 1)

~~Builders' Risk Insurance~~     ~~$ 11,719~~ _EW_
    ~~$322,763~~ _PB_

SUBCONTRACTOR:

Mid State Construction Company, Inc.
300 Briarwood West Dr.
Jackson, MS 39206

By: P.G. Bernheim
Title: Executive Vice President

CONTRACTOR:

U.S. Coating Specialties & Supplies, LLC
125 West Mayes Street
Jackson, MS 39213

By: Earl Washington
Title: President/CEO

SUBCONTRACT EXHIBIT "I"

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT is made and entered into effective as of the _23_ day of _November_, 2010, by and between Mid State Construction Company, Inc. ("Mid State"), U.S. Coating Specialties & Supplies, LLC ("USC"), and Trustmark National Bank (the "Bank"). The "Premises" for this Escrow Agreement are as follows:

A.     In order to obtain a contract (the "Contract") with the United States (the "Owner") for the project (the "Project") known as the ERDC Information Technology Laboratory Office Building and Computer Facility at the U.S. Army Engineer Research and Development Center in Vicksburg, Mississippi, USC has obtained and/or will obtain one or more bonds from Travelers Casualty and Surety Company of America (the "Surety") in relation to the Project and the Contract.

B.     The Surety provided and/or will provide said bonds in reliance upon the indemnity agreements (collectively the "Indemnity Agreements") of Mid State, William S. Ware ("Ware") and P.G. Bernheim ("Bernheim") (with Mid State, Ware and Bernheim sometimes herein collectively referred to as the "Mid State Parties").

C.     USC and Earl Washington ("Washington") (with USC and Washington sometimes herein collectively referred to as the "USC Parties") have also entered into that certain *Amended and Restated Agreement Regarding Bonding Credit* ("Credit Agreement") with Mid State and for the benefit of Mid State and the other Mid State Parties.

D.     In connection with the Credit Agreement and as part of the overall transaction as to same, the Mid State Parties also require that USC enter into this Escrow Agreement and other related documents and agreements.

E.     USC stipulates and agrees that the benefits flowing to it, directly and indirectly, as a result of the Credit Agreement, which allows it to have the benefits of having the Contract, are good and sufficient consideration for the obligations assumed by it under this Escrow Agreement and the other related documents.

F.     USC stipulates and agrees that it enters into this Escrow Agreement and the other related documents as a material inducement to the Mid State Parties to proceed with the Indemnity Agreements and the procurement of bonds for the Project. USC further stipulates and agrees that, but for its agreement to the terms hereof, the Mid State Parties would not proceed with same.

G.     The parties have agreed for, and Bank has agreed to serve and act as, escrow agent as provided for herein.

NOW, THEREFORE, for and in consideration of the Premises (which are incorporated into and made an express part of this Escrow Agreement), and in consideration of the mutual exchanges referenced therein and hereinbelow, the parties agree as follows:

MIDSTATE
000823

1.    The Bank shall serve as the Escrow Agent pursuant to the terms of this Escrow Agreement. ~~The Bank acknowledges that its fee for serving as Escrow Agent has already been paid.~~ *[handwritten]*

2.    The Bank hereby establishes as the "Escrow Account" account number /0.5000 6400 with the Bank at the Bank's offices in Jackson, Mississippi. All sums placed in the Escrow Account and all interest earned thereon shall be collectively referred to as the "Escrowed Funds." The Escrow Account shall be an entirely separate account established and maintained solely for the purpose of this Escrow Agreement. The Escrowed Funds shall be kept separately from any other funds of USC or any other person or entity. The Escrow Account shall be an interest bearing account. USC shall be entitled to all interest earned on the Escrowed Funds, except to the extent such interest funds are needed to satisfy sums otherwise due Mid State.

3.    USC shall take such actions as are necessary to see that all proceeds from the Contract are placed into the Escrow Account. The Bank shall upon instructions from Mid State take actions as necessary to secure its receipt of the Contract proceeds as contemplated under this Escrow Agreement, and, USC shall comply and cooperate with all such requests and actions by the Bank.

4.    A "Release Order" shall be one of the two following documents: (a) a written document signed by both Mid State and USC detailing what amounts are to be released and to whom; or (b) a "Final Ruling" detailing what amounts are to be released and to whom. A "Final Ruling" shall mean a final, court affirmed arbitration award resolving an issue under this Escrow Agreement, the Credit Agreement, or the subcontract (the "Subcontract") between Mid State and USC. A Release Order may cover less than all of the Escrowed Funds, and multiple Release Orders may be issued.

5.    USC and Mid State shall endeavor to agree on at least a monthly basis on the terms of Release Orders as necessary to make payments under the Subcontract and other Sub-Agreements (as defined in the Credit Agreement), consistent with the fact that the Escrowed Funds are a key source of payment of obligations owed under and in relation to the Contract and the Project, including without limitation as to sums owed under Sub-Agreements. USC and Mid State shall at completion of the Project attempt to agree upon the terms of a Release Order, consistent with the fact that the Escrowed Funds are being held for the security purposes otherwise provided for herein and as referenced in the Credit Agreement.

6.    None of the Escrowed Funds will be released except strictly per the terms of a Release Order; the only exception is that Escrowed Funds shall be disbursed per the control/Payment Order rights of Mid State as provided for below regarding its security interest. As noted below, Mid State can only exercise those rights upon the occurrence of an Event of Default.

7.    Once all the Escrowed Funds have been disbursed, then this Escrow Agreement shall terminate.

2

MIDSTATE
000824

8. USC does hereby collaterally assign and pledge to Mid State (and to the Bank for the benefit of Mid State) and grant Mid State (and to the Bank for the benefit of Mid State) a security interest in all the estate, right, title and interest of USC, whether now owned or hereafter acquired, in, to and under the Escrowed Funds, the Escrow Account and proceeds thereof (collectively the "Collateral"). This assignment, pledge and grant is given to secure payment and performance of all obligations owed and/or becoming owed to Mid State under and in relation to the Credit Agreement, and any failure of payment or performance by USC as to same shall constitute an "Event of Default." Further, any "Default" under the Credit Agreement shall also constitute an "Event of Default" hereunder. Upon any declaration by Mid State of an Event of Default, Mid State (and the Bank for the benefit of Mid State) may do one or more of the following, in such order and such multiple times as it deems appropriate: (a) proceed to protect and enforce the rights vested in it by this Escrow Agreement, including, but not limited to, the right to cause all sums and things pledged hereby as security and all other monies pledged hereunder to be paid directly to it; (b) cause any proceeding to be instituted and prosecuted to collect or enforce any of its rights; or (c) exercise any other or additional rights or remedies granted to a secured party under the UCC or other applicable law.

9. Pursuant to the above, USC has pledged to and created in favor of Mid State (and to the Bank for the benefit of Mid State) a security interest in and to the Collateral. All the Collateral shall at all times be subject to the control of Mid State (and of the Bank for the benefit of Mid State) and shall be held in the custody of the Bank in trust for the purposes of, and, on the terms set forth in, this Escrow Agreement. For so long as the Escrow Agreement remains in effect, the Bank waives its rights of chargebacks, setoff and/or banker's lien against the Collateral. Until this Escrow Agreement terminates in accordance with the terms hereof, Mid State (and the Bank for the benefit of Mid State) shall have "control" (within the meaning of Section 9-104 of the UCC). If at any time the Bank shall receive from Mid State any instruction directing disposition of any funds in the Escrow Account (a "Payment Order"), the Bank shall comply with such Payment Order without further consent by USC or any other person. In the event that the Bank has or subsequently obtains by agreement, operation of law or otherwise a lien or security interest in the Collateral, the Bank agrees that such a lien or security interest shall be subordinate to the lien and security interest of Mid State. Regardless of any provision in any other agreement, for purposes of the UCC, the State of Mississippi shall be deemed to be the Bank's jurisdiction (including, but not limited to, within the meaning of Section 9-304 of the UCC). The Escrow Account shall be governed by the laws for the State of Mississippi. The Bank hereby acknowledges Mid State's security interests and waives any security interest or other lien in the Collateral and further waives any right to set-off the Collateral now or in the future against any indebtedness of the USC. The waivers set forth in this paragraph are of rights which may exist now or hereafter in favor of the Bank in its individual capacity, and not of any such rights which may exist now or hereafter in favor of the Bank in its capacity as Escrow Agent. The Bank and USC additionally acknowledge that the Bank holds and/or will hold possession of the Collateral for the benefit of Mid State, including, but not limited to, for the purposes of Section 9-313 of the UCC. USC states that no other person holds a security interest in the Collateral. The Bank states that to its knowledge no other person has a security interest in, the right to control over, or the right to possession of the Collateral.

MIDSTATE
000028

10. USC and the Bank shall promptly execute and deliver all records, instruments and documents, and take all action, that may be reasonably necessary, or that Mid State may reasonably request, in order to perfect and protect the assignment and security interest granted or intended to be granted hereby or to enable Mid State to exercise and enforce its rights and remedies hereunder. USC and the Bank authorize Mid State to file one or more financing or continuation statements and other records with respect to all or any part of the Collateral without the signature or authorization of USC or the Bank.

11. This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of Mississippi. All claims and disputes arising out of and relating to this Escrow Agreement shall be decided by binding arbitration in accordance with the Construction Industry Rules of the American Arbitration Association. Each party shall be entitled to recover (as against the breaching party) its attorneys' fees, costs and expenses incurred in enforcing and/or protecting its rights hereunder.

12. Time is of the essence for each provision of this Escrow Agreement. If one or more of the provisions of this Escrow Agreement shall be held to be inoperative, unenforceable or invalid, such circumstances shall not have the effect of rendering any of the other provisions of this Escrow Agreement inoperative, unenforceable or invalid, and the inoperative, unenforceable or invalid portion provision shall be construed as if it were written so as to effectuate, to the maximum extent possible, the parties' intent. This Escrow Agreement may be amended only by a writing signed by duly authorized representatives of all parties.

13. This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

14. This Escrow Agreement is binding on the parties, their heirs, successors and assigns.

IN WITNESS WHEREOF, Mid State, USC and the Bank have executed this Escrow Agreement on the date first above written.

MID STATE CONSTRUCTION COMPANY, INC.

By: _____
Its: _____


U.S. COATING SPECIALTIES & SUPPLIES, LLC

By: _____
Its: _____

MIDSTATE
000826

4

TRUSTMARK NATIONAL BANK

By: _George Thornhill_

Its: _S.V.P. & T.O._

MIDSTATE
000827



**SPECIALTIES & SUPPLIES**

Lawson Industrial Park
125 West Mayes Street
P.O. Box 11809
Jackson, MS 39283-1809
Phone: 601-981-8986
Fax: 601-981-9583
info@uscoatingsspecialties.com

# EMPLOYEE LEASE AGREEMENT

(To lease a full-time Project Superintendent and Assistant Project Superintendent to US Coating Specialties and Supplies (USCSS), LLC for Contract #: W912EE-10-C-0019 U.S. Army Corp of Engineers ERDC ITL Office Building and Computer Facility Construction Project in Vicksburg, (Warren County) MS

This Employee Lease Agreement is between U S Coating Specialties and Supplies, LLC (herein referred to as *"Lessee")* and Mid State Construction (hereto referred to as "Lessor") to lease specified qualified approved persons to provide project superintendent and assistant project superintendent services to the *Lessee* for the successful and timely completion of US Army Corp of Engineers EDRC ITL Office Building and Computer Technology Facility as specified under the contract between *USCSS* and US Corp of Engineers.

## Scope of Work

The *Lessor* agrees provide the specified qualified approved persons to perform project superintendent and assistant superintendent activities during all stages of construction, equipment, material, and workers for the above referenced construction project, to include but not limited to:

Oversight of divisional work for the reference project, oversee subcontractors to complete specific pieces of the construction project which could include everything from site work, structural work, roofing, masonry, flooring installation and plumbing to painting; developing schedule diagrams for project; review construction plans and drawings for accuracy and completion; developing schedule of values, identifying definable features of work, construction submittal reviews and certifications, site inspections, documenting and maintaining records for the construction projects, performing project site inspections, monitor procedures for laying out of work, monitoring testing procedures, conducting training; collecting and inputting data in appropriate data collection software to track construction progress; plan, coordinate and/or conduct project site construction and safety meetings; attend pre-construction conferences, pre-warranty conference, *Lessee* construction division staff meetings, etc.

Review engineering and architectural drawing and specifications to monitor progress and ensure progress with plans and schedules.

Evaluate and determine appropriate construction methods and the most cost-effective plan and schedule.

Monitor the progress of construction projects.

Ensure the implementation of *USCSS* Accident Prevention Plan, Health and Safety Plan, and Environmental Protection Plan at the construction site.

Initial _____

**MIDSTATE
000408**

Provide Progress Schedule/ Construction Progress Chart and all other required reports request to USCSS.

Attend and participate in all scheduled and unscheduled staff, safety and/ or construction meetings and conferences held.

Review and approve all divisions of construction work at the construction site.

Collaborate and coordinate collectively with *Lessee* Project Manager, *Lessee* Construction Manager, *Lessee* Quality Control Manager, *Lessee* Safety Officer, sub-contractors, and other *Lessee* designated staff to ensure successful, safe, and timely completion of the construction project.

Participate and monitor Commissioning process at the construction site.

Coordinate, schedule, review, and obtain certification of project Submittals for the construction project.

Secure and manage the submittals of as-built drawings for the construction project.

Participate and monitor the construction project punch list items, close out and inspections at the construction site.

Prepare, for submission, all required documents.

Obligate no financial obligation on behalf of Lessee without the approval of *Lessee*.

Maintain all appropriate and required Quality Control Managers Certification OSHA, First Aid, CPR, etc. certifications required during the performance of this agreement.

Perform other related project superintendent and assistant project superintendent duties as assigned.

## Period of Performance

The period of performance of this agreement shall commence October 23, 2010 for the Leased Project Superintendent, December 1, 2010 for a Leased Assistant Superintendent and end no later April 30, 2012 or the timely and successful completion of US Army Corp of Engineers EDRC ITL Office Building and Computer Technology Facility construction project. The parties may agree, through execution of an agreement modification, to extend this agreement for a period of time agreed upon by both parties.

**Consideration and Payment** $2,354.$^{75}$  $1,083.$^{53}$      *See attached "Exhibit A"*

As consideration for the performance under this lease agreement, the *Lessee* agrees to reimburse the *Lessor* a maximum rate of ~~$1,990.00~~ per week for the approved Project Superintendent and reimburse the Lessor a maximum rate of ~~$400.00~~ per week for the Assistant Superintendent for work performed during a five (5) to seven (7) per work week. The *Lessor* and the *Lessee* may agree through the execution of an amendment this lease agreement to increase the total amount of this lease agreement should the period of performance be extended.

Under this lease agreement the *Lessor* shall be responsible for the leased employee's employment, withholding requirements, i.e. federal and state taxes, FICA, liability insurance, unemployment tax, Workman Compensation withholdings, retirement, health benefits, transportation and expenses, etc. The *Lessor* agrees to provide proof of liability insurance to *Lessee* upon the execution of this employee lease agreement.

**Other Consideration**

Initial _____

As consideration for duties performed under this lease agreement, *the Lessee* agrees to provide the *Lessor* *leased employees* with an appropriate work space at the job site to perform duties and responsibilities under this agreement. *The Lessee* also agrees to equip the work space with appropriate telecommunication, computer equipment and computer software, and supplies to perform duties and responsibilities under this agreement. The *Lessor's* agrees be responsible for care of and maintenance of all equipment and supplies assigned to the leased employee by the *Lessee* at the level of care and operation issued to the *leased employee* under this agreement. The *Lessor* agrees to repair or replace any damaged, lost, or stolen equipment assigned the leased employee.

## Ownership of Documents and Work Products

All documents, notes, programs, databases, files, reports, and other material collected and prepared by the *leased employee* in connection with this agreement, whether completed or in progress, shall be the property of *Lessee*.

## Record Retention and Access to Records

The *Lessor* shall maintain and make available to Lessee any records, supporting documents, statistical records pertinent to the services performed under this lease agreement. These records shall be maintained for at least three (3) years; however; if any litigation or other legal action, by or on behalf of *Lessee* had begun that is not completed at the end of the period of the agreement, or if audit findings, litigation or other legal action has not been resolved a three (3) year period, records shall be retained until resolution.

## Modification or Amendment

Both *Lessor* and *Lessee* affirm that both have read and understand the clauses contained herein. No prior terms varying or contradicting this agreement exist. Both agree that this agreement constitutes the entire understanding between the parties. Modification, changes or amendments to this agreement may be made upon mutual agreement of the parties hereto. However, any changes, supplement, modification or amendments of any term, provisions or conditions of this agreement must be in writing and signed by both parties hereto.

## Assignment

The *Lessor* shall not assign or otherwise transfer the obligation incurred on its part pursuant to the terms of this agreement without the prior written consent of *Lessee*. Any attempted assignment or transfer of its obligations without such consent shall be null and void. All obligations and duties of either party under this agreement shall be binding on all successors in interest or assigns of such party.

## Availability of Funds and Expenditures Approval

It is expressly understood and agreed by both parties that the obligations of *Lessee* to proceed under this agreement is conditioned upon the availability of funds to perform construction activities or the lack of adequate, accurate, and timely performance by the *Lessor*, whichever comes first. If the funds anticipated for the continuing fulfillment of the agreement are, at any time, not forthcoming or insufficient, either through the failure of the federal government to provide funds, or discontinue or material alteration of the project under which funds were provided or if funds are not otherwise available to *Lessee*; or if the *Lessor* *leased employee* performance is determined to be insufficient, inaccurate, and /or untimely; whichever comes first. The *Lessee* shall have the right upon thirty (30) days written notice, and final payment to the *Lessor* to terminate this agreement without further damage, penalty, and cost or expense to *Lessee*. The effective date of termination shall be as specified in the notice of termination.

For the faithful performance of the terms of this agreement, the parties hereto have caused this agreement to be executed by the undersigned authorized representatives.

Initial _____

**MIDSTATE**
**000410**

_Earl Washington_
Earl Washington, President/CEO
US Coating Specialties and Supplies, LLC

_2/3/2011_
Date

_W. L. S____
William S Ware, President/CEO
Mid State Construction, LLC

_3/8/2011_
Date

_Velma Day_
Witness

_2/3/2011_
Date

_Anna Victoria_
Witness

_3/8/2011_
Date

Initial _____

## EMPLOYEE LEASE AGREEMENT

## "EXHIBIT A"

The calculation of the weekly lease rate for the Project Superintendent is:

Weekly salary    $1,635.20
Federal and state employment taxes, worker's compensation insurance, company health insurance and retirement plan contributions        $490.56
Personal vehicle reimbursement allowance    $216.66
    (gas paid on Company credit card & billed separately)
Cellular telephone        $12.33

Total    $2,354.75 per week

The calculation of the weekly lease rate for the Assistant Superintendent is:

Hourly rate    $20.60
Federal and state employment taxes, worker's compensation insurance, company health insurance and retirement plan contributions , per hour        $6.18
Personal vehicle reimbursement allowance    $N/A
 Cellular telephone        $12.33
Based on 40 hour week @ $26.78. Overtime hourly rate is $40.17

Total    $1,083.53 per week

Initial _____